Bull v. Southwick.

The decree is a proper one upon the case made by the proof, and is affirmed.

Decree affirmed.

Thomas J. Bull, Appellee, v. James W. Southwick, Appellant.

John D. Barncastle, Appellee, v. Martin Amador, Appellant.

Evangelisto Chaves, Appellee, v. Maximo Castenada, Appellant.

*August and November, 1882.*

Elections.    (1) *Duties of canvassing boards ministerial, not judicial.*
Same.    (2) *Judges of election; their failure to take oath does not vitiate their returns.*
Same.    (3) *Canvassing boards, duty of, as to counting votes returned.*
Same.    (4) *Contest to be made in district court.*
Same.    (5) *False returns rejected as evidence.*
Same.    (6) *Mode and form of making up returns.*
Same.    (7) *Contest, amendment of pleadings in.*
Same.    (8) *Contest, pleadings, failure to deny, admits allegations.*
Same.    (9) *Contest, nature of proceeding.*
Same. (10) *Quo warranto not superseded by statutory proceedings to contest.*

1.    Canvassing boards of elections have only ministerial functions to canvass and count votes as returned by the judges of election, to ascertain and declare the respective majorities of votes received by the respective candidates for office from the aggregate number of votes so returned by the judges of election. They have no judicial powers whatever to pass upon and decide as to the illegality of individual votes received and returned to them by the judges of election.
2.    The canvassing board of elections cannot reject as illegal the votes of any precinct, on the ground that the judges of election in such precinct did not take and subscribe the oath of office as required by law. The judges of election of such precinct, notwithstanding they may not have taken and subscribed the oath required by the statute, are

21

nevertheless *de facto* judges of election, and their official acts otherwise regular, are entitled to full faith and credit. Their omission to take the oath, while it might render them liable to prosecution and severe penalties, can not in any way affect the legality of votes received and returned by them; and it is the duty of the canvassing board to can-vass and count all such votes for the respective candidates for whom they are cast.

3.  Whenever votes have passed the judges of election, and have been received by them as votes, and as such returned by them to the can-vassing board, as having been cast for certain candidates respectively —the returns showing in an intelligible manner the number of votes, and for whom cast—it becomes the ministerial duty of the canvass-ing board to count all such votes, and declare the result from such returns alone, without sitting as a court of review—in the absence of the parties interested—for the purpose of passing upon the illegality or legality of individual voters whose votes have been so returned to them.

4.  After votes have been received and regularly returned by the judges of election, and questions as to the illegality of any such votes shall subsequently be raised, the respective candidates for whom such votes are cast are on principle and as a matter of law, as much entitled to their day in court, and to be heard thereon before such votes are rejected, as are the litigants in any other form of judicial proceeding. The only lawful tribunal having original jurisdiction to determine questions of this kind is the district court, which is to proceed in the mode prescribed by the act of 1876: Prince's Laws N. M., 134.

5.  When the election returns of a certain precinct were false, in that certain persons were therein stated to have voted, who did not in fact vote at such precinct at all, and it further appeared from such returns that all the voters at such precinct voted in *alphabetical order*, and it could not be ascertained from the poll books and returns of such pre-cinct, for whom or what ballot any voter voted, it was held that they were not evidence that any of the persons whose names were recorded in such poll books and returns voted, and that to determine this mat-ter a resort must be had to evidence *aliunde*.

6.  The mode and form prescribed by law for making out poll books and election returns, is as follows: The ballot of the first voter appearing at the polls and voting is to be numbered one by the judges of elec-tion. The same number is to be put down by them in the poll books, and opposite the same number in the proper column therein, is to be written the name of such voter. The ballot so numbered is then to be deposited in the ballot box.

The ballot of the second voter appearing and voting is to be num-

Bull v. Southwick.

bered two, and the same number put down in the poll book next in order after No. 1, and the name of the voter voting that ballot so numbered is to be written down opposite that number in the poll book, and the ballot then deposited in the ballot box.

The same numerical order and record is to be observed and kept with each voter as he appears and votes.

At the close of the polls the names of the respective candidates voted for by each ballot so numbered and recorded are to be written down in the appropriate columns, and in the proper column under the name of each candidate so voted for, and opposite the same number in the poll book which the ballot bears, and opposite the name of the voter voting the same, is to be recorded the vote showing that the voter has cast one vote for each candidate so voted for by him.

The poll books of the several precincts with the proper certificates attached and so filled out, constitute the returns of the judges of election, to be transmitted to the canvassing board.

7. The notice of contest alleged the illegality of sixty-nine votes. The respondents failed to deny this allegation in their answers, but some time after the expiration of the time allowed by law for them to answer in, moved for leave to file a supplemental answer denying this allegation, urging that the failure to deny in the first answer was solely owing to the negligence and omission of counsel. This motion was overruled.

*Held,* that the statutory provisions as to the time of filing and serving the notice of contest, answer and reply are in effect, statutes of limitation, taking from the judge all discretion as to extending the time.

8. The failure to deny such allegation admits it to be true, and if evidence is taken, as if an issue had in fact been made by filing a denial in proper time, such evidence will be disregarded as immaterial.

9. A proceeding to contest an election is a proceeding exclusively between rival candidates for office, and the people are in no sense parties to it.

10. The proceedings authorized by statute to contest elections do not supersede the proceeding on behalf of the people by writ of *quo warwanto,* to oust from office one who was not elected thereto by a majority of legal votes. PRINCE, Chief Justice, dissents.

Appeals from the District Court of Doña Ana county

These were proceedings under the statute to contest the respective elections of appellants to the offices of sheriff, treasurer and judge of probate for the county of Doña Ana, at

an election held on November 2, 1880. By stipulation of counsel the three cases were heard and determined together in the court below, and they were in like manner argued and submitted in this court.

In the first case Thomas J. Bull served and filed notice of contest upon the respondent, James W. Southwick, for the office of sheriff of Doña Ana county. In the notice of contest, the contestant used printed forms, alleging, among other things, illegal votes cast and counted for respondent at the last election for said office, and set out various causes, rendering said votes illegal. The contestant also alleged irregularity of the returns of the election at the Las Cruces precinct.

The respondent replied, serving and filing his answer within the time required by the statute, specifically denying the allegations in contestant's notice, except that in the denials, which were made in the order of the allegations in contestant's notice, by a clerical error, one of the allegations is not specifically denied.

Following the several specific allegations touching the individual voter, the contestant, in his notice, alleges generally that the vote, etc., was unlawfully registered, received, and counted, etc. These allegations are specifically denied by the respondent's answer.

The contestant filed his replication, and served the same within the time contemplated by law.

The respondent applied to the judge to fix the time within which to take testimony, and at the same time applied for leave to file an amendment to his answer, which motion for leave was overruled by the court, and the respondent excepted. Thereafter, upon notice by respondent to contestant, testimony was taken. Contestant took testimony regarding quite all the votes alleged by him to be illegal votes. The contestant introduced no proof to sustain his allegations as to the Las Cruces precinct, except the poll-book and tally

list of votes. The respondent introduced proof to show the regularity of the election at Las Cruces precinct, etc., etc.

The respondent asked again for leave to amend his answer. The court overruled motion for leave to amend, and ruled out certain evidence, to wit, all evidence of the respondent's touching the legality of the votes alleged by contestant's notice to be illegal votes, and without finding that the contestant received a majority of the votes cast at said election, rendered judgment in favor of contestant. To all of which respondent excepted.

On June 1, 1881, the case was argued and submitted, and on December 14, 1881, the court rendered its judgment.

The facts found and the conclusions drawn by the court are the following:

That it appears from the returns of the judges and clerks of election, from each of the precincts in the county, that the contestant, Thomas J. Bull, received for the office of sheriff two more votes than the respondent, James W. South-wick; contestant, Barncastle, received nine more votes for the office of treasurer than respondent, Amador, and respondent Casteñada, received twelve more votes than contestant, Chaves, for the office of judge of probate.

That the board of county commissioners, acting under the statute as, *ex officio*, a board of canvassers, illegally assuming judicial functions, went behind the returns and rejected certain votes as illegal, in such manner as to show a majority for Southwick of nine votes, for Amador of two votes, and for Casteñada of twenty-three votes, and (wrongfully as to the first two) issued to them, respectively, the certificates of election to the several offices.

That the returns of the judges and clerks of precinct No. 3, which gave a majority of fifty-six votes for Southwick, of sixty votes for Amador, and of eighty-nine votes for Casteñada, were so false, contradictory and unreliable as to render

it impossible to determine therefrom what persons voted for the respective offices.

That the testimony taken before the master on the part of respondents against the objection of contestants, tending to show that the sixty-nine persons before mentioned had been residents of the county for three months immediately preceding said election, was irrelevant, improperly taken and not to be considered, and that said sixty-nine votes for respondent were illegal, as appeared by the pleadings.

The contestant Bull received a majority of the legal votes cast, and was entitled to the office of sheriff. The same result followed in the other two cases, and judgment was accordingly entered, from which the respondents respectively appealed to this court.

No motion for a rehearing or in arrest of judgment appears to have been made.

The other cases are the same in facts and questions of law as *Bull v. Southwick.*

*S. B. Newcomb, W. L. Rynerson* and *John D. Bail,* for appellants.

The judge did not, in his opinion, find facts upon which to base his judgment.

The court below erred in refusing the amendments to supply what is plainly a clerical omission. This is evident from the answer itself: Act of N. M. Legislature, 1878, par. 54, p. 1220, Prince's Statutes.

The special law of 1876 in regard to the mode of procedure in contested election cases has been changed and modified by statute of 1878 above cited, and secs. 1, 2 and 5, at p. 54, Session Laws 1878.

The main question to be decided by this court is: Did the court below err in refusing to allow the appellants to amend their answers? In order to arrive at a true solution of this question, it will be necessary to briefly review the general principles underlying all election laws in reference to contests.

Bull v. Southwick.

The rule is universal that the person having a legal majority of the votes cast must prevail. And to arrive at this determination the case must be considered upon the merits. It is true different states have different laws and methods of trying cases of this description, but they all have the same end in view; all conform to the same universal doctrine, that the will of the people, as expressed through the ballot box, must be respected; in other words, whoever has received a majority of the legal votes cast shall be entitled to and shall receive the office to which he was elected by the people.

Such proceedings are not to be strangled by technicalities, but examined upon their merits, and the courts are to adjudge and decree which of the candidates received the highest number of legal votes: *Re* Duffy, 4 Brews. (Pa.), 531; United States Digest, new series, vol. 4, p. 259, sec. 24.

"Mistakes should always be corrected, and in determining this and similar questions, on cases of contested elections, it should be kept constantly in mind that the ultimate purpose of the proceeding is to ascertain and give expression to the will of the majority as expressed through the ballot box and according to law. Rules should be adopted and construed to this end and to this end only:" McCrary, p. 137, sec. 132.

The problem is to secure, first, to the voter a free and untrammelled vote, and secondly, a correct record and return of the vote. It is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. But these rules are only means. The end is freedom and purity of elections. To hold that these rules are mandatory and essential to a valid election, is to subordinate substance to form, the end to the means:" McCrary, p. 155, sec. 200.

An election with us is the deliberate choice of a majority or plurality of the electors. Any doctrine which opens the way for minority rule in any case is anti-Republican and anti-American: McCrary, p. 209, sec. 234.

The broad doctrine was asserted that in this country an election by a minority of the persons voting is not to be tolerated under any circumstance: *Id.*, sec. 235.

A contested election case, whatever the form of the proceedings may be, is in its essence a proceeding in which the people are primarily interested: *Id.*, sec. 316; *Whisor v. Kidder*, 43 Cal., 237; *Saunders v. Haynes*, 13 Cal., 154; *Learey v. Snow*, 15 Cal., 118.

Nowhere does a different doctrine obtain. Can it be conceived, then, that it has been left to New Mexico alone to run counter to all recognized law and authority on this subject? Did the legislators of New Mexico intend to make a law that would turn a man out of an office to which the people had duly elected him, because, forsooth, his attorneys had made a mere slip of the pen? The learned judge below admits that Castañada was duly and fairly elected. Still he turns him out and puts into his place a man whom the people had rejected. Could the makers of the law ever have intended or even contemplated the possibility of such a proceeding? To state so startling a proposition is to answer it.

Keeping in view these well settled principles, how should our statute be construed? So that the will of the people should be disregarded and minority condidates inducted into office, or rather that the will of the people should be respected and the candidate who received a majority of the votes cast, should be declared elected?

That the candidate receiving a majority of the legal votes cast, shall in all cases prevail, the authorities say, is the chief object of all legislation on this subject; and, indeed, our own statute—this arbitrary, tyrannical, technical statute, as counsel for appellees would have us believe—positively enacts that whoever receives the majority of the legal votes shall be declared elected; thereby conclusively showing that they never intended that a minority candidate should receive the office under any circumstances whatever.

Counsel for appellees say that the words in the statute, "within the time aforesaid,".render it mandatory and nullify the clause that a majority shall prevail.   This we deny. We say the majority clause qualifies and explains the limitation clause.   We have clearly shown that all election laws must be construed to give effect to the will of the people as expressed at the ballot box.   To this end all such laws are made,   In the construction of statutes, affirmative words enjoining the performance of an act by a public officer are generally regarded as directory only; negative words make a statute imperative : Dwarris on Statutes, 175 ; *Stephenson v. Lawrence*, Brightley's Leading Cases on Elections, p. 527 ; Bacon's Abridgment, vol. 9, p. 234.

In our statute no negative words are employed.   It is in effect the same as the statutes of other states, where they provide that whatever is not specifically denied in pleadings shall be taken as true.   The Iowa statute provides that. "a reply shall be filed before noon of the day succeeding that on which the answer was filed," and if not so filed, the material allegations of the answer shall be deemed true.   Under this statute the court allowed a reply to be filed after the time allowed for the filing had elapsed : *Williams v. The Niagara Fire Ins. Co.*, 50 Iowa, 562.

California has a similar statute, and there amendments are allowed : *Fish v. Redington*, 31 Cal., 185 to 195.

The Illinois statute provides that a person desiring to contest an election "shall, within thirty days after the person whose election is contested is declared elected, file with the clerk of the proper court a statement in writing setting forth the points on which he will contest the election."

The supreme court decided that such could be amended after the expiration of the thirty days : *Dale v. Snow*, 78 Ill., 171.

Here we have three supreme courts, under statutes in effect the same as ours, deciding that amendments should be al-

lowed. No case can be found where a contrary doctrine has been held under like statutes.

We understand that the chief justice of this court allowed (and properly) full and liberal amendments to petitions in contested election cases, under our statute, after the time limited by said law had elapsed.

It is undoubtedly a well-established principle in the exposition of statutes that every part is to be considered, and the intention of the legislature to be taken from the whole. It is also true that when great inconvenience will result from a particular construction, that construction is to be avoided, unless the meaning of the legislature is plain, in which case it must be obeyed :" *Fisher v. Blight*, 2 Cranch, 386 ; Marshall, C. J.

Can it be contended that the meaning of the legislature is plain that no amendments can be allowed in these cases under our statutes in furtherance of justice ? From the principles and authorities above quoted, it is evident the legislature never intended to deprive a legally elected candidate of his office on a mere mistake or clerical error, or failure to make a mere denial. Is not the great inconvenience to the public plain here ? They are deprived of their choice by a narrow, illiberal and technical construction of an election law, which all the authorities say should be liberally construed, and with the sole end in view of seating the candidate whom the people elected—who had a majority of the legal votes.

A material admission in an answer against a defendant even after evidence taken, upon application should be amended: United States Digest, first series, vol. 1, secs. 1211, 1212, 1213, 1214 and 1215, p. 238 ; *Taylor v. Dodd*, 5 Porter (Ind.), 246 ; *Stringer v. Davis*, 30 Cal., 318.

As to amendments generally, see United States Digest, first series, vol 1, secs. 422, 424 and 437, p. 202 ; *Ib.*, sec. 772, p. 218 ; *Ib.*, sec. 1034, p. 232 ; *Soper v. Soper*, 5 Wend. (N.

Y.), 112; Wait's N. Y. Digest, vol. 2, secs. 2042, 2048, p. 1333.

The learned judge below raises a point, viz.: That the answer of Casteñada was not served until after the twenty days allowed by law. A sufficient answer to this objection is that the contestant Chaves replied to the answer and went to trial without objection. He thereby waived the irregularity, if any there was; under these circumstances it would make no difference if the answer had never been served. This principle is so well settled that we hardly deem it necessary to quote authorities. We may refer, however, to McCrary on Elections, sec. 394, p. 330, and Wait's N. Y. Digest, secs. 70, 71, p. 1396.

When a court has a discretion to allow amendments and refuses on the ground of want of power, such refusal is error: Ct. App., *Russell v. Conn.*, 20 N. Y. (6 Smith), 81; 3 Wend., 336; Hill & Denio, 103; 12 Abbt., 16; Wait's N. Y. Digest, vol 1, sec. 9, p. 79.

As to Cruces precinct, No. 3. Informality in making election returns not allowed to operate to disfranchise voters: 29 Ill., 414; *People v. Cook*, 14 Barb., 259; *Andrews v. Saucier*, 13 A., 301; *Weaver v. Given*, 1 Brewster (Pa.), 140, Contested Election, 5 Phil. (Pa.), 102.

Names arranged alphabetically, no objection: McCrary, sec. 100; *Hogan v. Pile*, 2 Bartlett, 281.

Ballot implies secrecy: U. S. Digest, new series, vol. 4, sec. 10, p. 258; McCrary, sec. 413, p. 353, also same, p. 455, Maine court.

Our own statutes provide for a secret ballot: Compiled Laws, sec. 22, p. 436.

As to the second count of ballots, we contend that the county commissioners had no authority to reopen the ballot boxes and recount the ballots. The only semblance of authority for such proceeding is to be found in sec. 22 of the act of 20th of July, 1851, p. 426, Compiled Laws. The

mode of contesting elections under that law, was entirely
different from the present (see secs. 48 to 55, of said act), the
whole machinery of which has been repealed, this recounting
section included.   The law simply states that the result (of
such recount) shall be forwarded to the powers authorized by
law, to determine the legality of the election.   The law
entirely fails to state what "the powers" shall do with it,
when they get it, and what effect it shall have.   This is cer-
tainly not conclusive evidence.   It might possibly be used to
assist the court in the examination of the case, as briefs of
counsel, but can have no greater effect.   We consider this
proceeding an unlawful and unauthorized interference with
the ballot boxes, and at least gave an opportunity for tamper-
ing with the ballots.   This recounting of the ballots after the
result has been declared, is not favored by the courts :   Mc
Crary on Elections, secs. 93 to 96, 279, 280.

We are satisfied that the recount in the case of *Bull v.
Southwick*, was not correctly made; that there are no such
ballots as "Aimes Sandi" or as "Sandique."   We believe
this latter ballot will be found to read upon examination,
"Saudique," the Mexican way of spelling Southwick, and
the first named ballot will be found to read "llimes saure,"
also the Mexican way of spelling James Southwick.

As to imperfect ballots, the whole law on the question of
imperfect ballots is fully laid down in McCrary on Elections,
secs. 395 to 398, inclusive.

The county commissioners, in their pretended recount of
January 6th and 7th, 1881, have reported the following, as
imperfect ballots voted for the office of sheriff, to wit :

|  |  |
|---|---|
| T. J. Bull, | 6 |
| Thomas Bull, | 3 |
| T. Bul, | 1 |
| Th. Bull, | 2 |
| James Southwick, | 4 |
| Southwick, | 3 |

Bull v. Southwick.

| | | | | | | |
|---|---|---|---|---|---|---|
| James M. Soulhowyck, - | - | - | - | - | - | 1 |
| J. M. Southwick, | - | - | - | - | - | 3 |
| James Southwith, - | - | - | - | - | - | 1 |
| Sandique, - | - | - | - | - | - | 5 |
| Aimes Sandi, | - | - | - | - | - | 1 |

We think that the ballots written "Thomas Bull," and "James Southwick," are not imperfect ballots. A man's middle name, is no part of his name in law. Therefore we think the three votes cast for "Thomas Bull" and the four cast for "James Southwick," should be counted for Thomas J. Bull and James W. Southwick respectively, without proof *aliunde* as to their identity.

The law is well settled, that if ballots are cast for a candidate, written with merely the initials of his first name, or even his surname alone without initials, if proof be introduced showing that they were cast for that candidate, such as, that there was no other person of that name running for that office, or that the candidate commonly wrote his name in that way, or that others commonly wrote his name in that way, etc., the ballot must be counted for the party intended.

The contestant, Thomas J. Bull, has entirely failed to offer any evidence tending to show that any of these imperfect ballots were intended for him, therefore, none of them can be counted for him; while on the other hand, the respondent, James W. Southwick, has introduced evidence plainly showing that the ballots written " James Southwick," "Southwick," " J. W. Southwick," " James Southwith," " James W. Soulhowyck," " Saudique " (reported by commissioners " Sandique "), " llimes saure " (reported by commissioners "Aimes Sandi "), were intended and cast for him. The ballots James W. Soulhowyck and James Southwith, although poorly spelled, are so evidently intended for the respondent, that, in fact, they prove themselves upon their face ; they are in fact *idem sonans*. As to the ballots " Saudique " and " llimes saure," it will be remembered that they are written

by Mexicans in the Spanish language, and in the manner in which they spell and pronounce " Southwick," as shown by the evidence.

By a strict construction of law none of the imperfect ballots can be counted for the contestant, Bull; but respondent's proof as to the imperfect ballots is amply sufficient to admit them for him. The presumption is very strong, that the judges and clerks of election counted these imperfect ballots for the persons for whom they were intended; for this reason, we think it fair that they all be counted for the respective parties, as certified by the judges and clerks of the respective precincts, but we are not willing that they should be counted for the contestant, and any of the respondent's thrown out.

There is another question worthy of the serious consideration of the court: From the fact that no allegation has been made on either side in reference to these imperfect ballots, will the court go behind the certificate of the judges and clerks of election to ascertain for whom they were cast? Or, in other words, will the court, in the absence of all allegations in the pleadings, change the count as certified by the judges and clerks of election, and reject these votes, simply on the ground of their informality?

The identity of parties will be presumed from identity of names. It was intimated by contestants' counsel that the respondents, in proving up the three months' residence of. the voters challenged by contestants, failed to prove the identity of the men examined by them, with that of the men challenged by contestants. We reply that " the identity of name is *prima facie* evidence of the identity of the person." See *People v. Thompson*, 28 Cal., 215; *Garwood v. Garwood*, 29 Cal., 515; *Douglass v. Dakin*, 46 Cal., 50; *Thompson v. Maureu*, 1 Cal., 428; 1.Greenleaf on Evidence, sec. 575, note 1.

Bull v. Southwick.

We again call the attention of the court to the legal points made by us in the beginning of this case.

*First.* The question to be decided in this case, is: Which party really received a majority of the legal votes cast? This question must be determined by the proofs: Brightley's Leading Election Cases, p. 381; McCrary on Elections, secs. 132, 544.

*Second.* A liberal construction should be given to election laws, with the view of ascertaining and giving effect to the will of the people, as expressed by them at the polls: McCrary on Elections, secs. 387, 554, 353; U. S. Digest (new series), vol. 9, sec. 20, p. 259.

*Third.* The ordinary rules of procedure and practice ought not to be strictly applied, because the people as well as the adversary parties are interested, whatever the form of the procedure—whether by *quo warranto,* or under a special statute: *Budd v. Holden,* 28 Cal., 139; McCrary on Elections, secs. 316, 374, 382.

*Fourth.* The case must be determined upon the merits, and judgment rendered for the party which the proofs show received the majority of the legal votes: Prince's Statutes, p. 346, sec. 8. And judgment cannot be given upon the pleadings; the law itself negatives such a conclusion. And this is the principle running through all the authorities: *Keller v. Chapman,* 34 Cal., 640; *Searcy v. Grow,* 15 Cal., 119; *Minor v. Kidder,* 43 Cal., 236, 237, 238; McCrary on Elections, sec. 359; United States Digest (new series), vol. 4, p. 258, secs. 19, 24.

*Fifth.* The court below erred in refusing to allow respondents to amend their answers. See authorities cited on this and last page. The pleadings can be amended at any time in the furtherance of justice: *Kneass's Case,* Brightley's Leading Election Cases, p. 337, *et seq.,* and note; McCrary on Elections, secs. 283, 285. And this may be done *nunc pro tunc* at any time before judgment or decree.

In conclusion, according to the returns, as certified to by the judges and clerks of election of the respective precincts, the whole number of votes cast and counted for the respective parties hereto, stood as follows : Thomas J. Bull, sheriff, 643 ; James W. Southwick, sheriff, 641 ; J. D. Barncastle, treasurer, 638 ; Martin Amador, treasurer, 629 ; Evangelisto Chaves, probate judge, 629 ; Maximo Casteñada, probate judge, 641.

The following statement shows the state of the poll of the respective parties, after deducting the illegal votes cast, as shown by the evidence :

| | |
|---|---|
| Thomas J. Bull, - - - - - - 643 | |
| Illegal votes, - - - - - 63 | |
| Legal vote for Bull, - - - - - | 580 |
| James W. Southwick, - - - - 641 | |
| Illegal votes, - - - - - 15 | |
| Legal vote for Southwick, - - | 626 |
| Majority for Southwick, - - - | 46 |
| John D. Barncastle, - - - - 638 | |
| Illegal votes, - - - - - 66 | |
| Legal vote for Barncastle, - - | 572 |
| Martin Amador, - - - - 629 | |
| Illegal votes, - - - - - 15 | |
| Legal vote for Amador, - - - | 614 |
| Majority for Amador, - - | 42 |
| Evangelisto Chaves, - - - - - 629 | |
| Illegal votes, - - - - - 66 | |
| Legal vote for Chaves, - - - | 563 |
| Maximo Casteñada, - - - - 641 | |
| Illegal votes, - - - - - 15 | |
| Legal vote for Casteñada, - - - | 626 |
| Majority for Casteñada, - - | 63 |

We claim that the three votes proven to have been illegal, in the evidence taken in the case of *Chaves v. Castenada*, above alluded to, should be deducted from the number of votes cast for Bull. This would leave Southwick's majority 49.

It will be observed that we have conceded in the above statement that the contestants have proven that fifteen of the votes cast for respondents were illegal. We think this is a liberal estimate, and that we have over, rather than under, stated the number. This concession is made, upon our view of the law, and understanding of the evidence; applying the same rules to these fifteen persons, which we insist should be applied to the sixty-six, which we claim should be deducted from contestants.

Finally, we insist that the evidence is conclusive that all the respondents were fairly elected by a majority of all the legal votes cast. That the will of the people, thus expressed at the ballot box, should, and we believe will, be respected by the court, and judgment given for the respondents accordingly.

*A. J. Fountain, Catron & Thornton* and *Fiske & Warren,* for appellees.

As to the pleadings. The court below correctly held that "any material fact alleged in the notice of contest, not specifically denied by the answer, within the time aforesaid, shall be taken and considered as true." This is the clear and unmistakable language of the act of 1876; Prince's Comp., p. 344.

Was there any material fact so alleged and not denied ? It is incontestable, and stands admitted, that the notice named sixty-nine different persons who voted for appellant, as to each of whom it is distinctly charged that "he had not resided in said county of Doña Ana for three months immediately preceding said election." That this is a "material fact" must be conceded: Act of 1868, Prince's Comp.,

389.   That no specific denial of this fact, within twenty days, was made, is also undisputed.   The inevitable conclusion is that reached by the trial court, that this fact was admitted by the pleadings, and hence, that these sixty-nine persons did not possess one of the indispensable qualifications, and their ballots were absolute nullities in contemplation of law.

Inasmuch as these sixty-nine illegal votes are essential to give appellants any pretense of a majority, under any claim whatever, it would seem unnecessary to pursue the matter further, unless there be some authority higher than the legislative assembly to negative its plainly expressed will, or some mysterious power of construction vested in the courts which, while admitting the plain enactment, can dispense with obedience to its requirement.

Counsel for the appellants say the case must be determined upon the evidence and the merits, and that judgment cannot be given upon the pleadings, yet they allege as error that the court below refused leave to appellant to amend his answer.

It would seem an idle thing to ask leave to amend a pleading which cuts no figure in the proceedings; and if counsel really believed that the judgment of the trial court in this statutory proceeding must be based only upon the evidence produced, without regard to the pleadings, they surely would not have asked leave more than fifty days after the time had elapsed for answering, after the reply had been filed and evidence taken, to amend the answer or to file a supplemental answer; or, if they did so, they would not assign as error in this court, the refusal of such leave.   By their own act they admit that which is too evident for argument, that their proposed amendment, denying the allegation of notice of contest as to the three months' residence in the county of the sixty-nine voters in question, was material and necessary.

Bull v. Southwick.

The only point to consider is whether the refusal of leave to amend constituted error sufficient for reversal.

This is a special statutory proceeding. The legislature has spoken in plain language, and there is no room for judicial construction or legislation. The answer must be filed within twenty days, and any material fact "not specifically denied within the time aforesaid, shall be taken and considered as true."

The court has no discretionary or dispensing power, even in matters of practice when the legislature has spoken : Sedgwick on Stat. and Const. Law, p. 322 ; Dwarris on Stat. Law, p. 477. Where a statute declares that a judge at chambers may direct a new trial if application is made within ten days after judgment it has been said "he can no more enlarge the time than he can legislate in any other matter :" *Seymour v. Judd*, 2 Const., 464 ; *Bleeker v. Wiseburn*, 5 Wend., 136.

When a statute fixes the time within which an act must be done, the courts have no power to enlarge it, although it relates to a mere question of practice. So, where an appeal to be valid must be made within ten days, it is void if taken on the eleventh : *Bleeker v. Wiseburn, supra ; Seymour v. Judd, supra; Ex parte Ostrander*, 1 Denis, 680–1 ; *Barclay v. Brown*, 7 Paige, 245 ; *Caldwell v. The Mayor, etc.*, 9 Paige, 572 ; *The Queen v. The Mayor, etc.*, 11 A. and E., 512 ; Hobert, 298 (K. B., 1625); Siderfin, 56 (K. B., 1670); Strange, 1125 (K. B., 1710); 2 T. Rep., 395 ; *The Bank, etc., v. Widner*, 11 Paige, 529.

The proceedings in cases of contested elections are properly regulated by territorial legislation under the organic act. It is "a rightful subject of legislation."

Each state has provided for itself some summary method of proceeding in such cases, incorporating such provisions as seemed to its legislative power wisest and best adapted to its peculiar condition.

The power of each state is only limited by constitutional

restriction, state or federal, and that of each territory only by the constitution and acts of congress.

In the absence of such restriction, the act of our legislative assembly is supreme, and it is the plain duty of the courts, as of all others, to give it obedience.

The diversity of state legislation upon the subject renders the local decisions of one state of little aid in construing the election laws of another. Each act must be viewed in the light of the legislative will, as expressed, and hence the citations of authorities by appellee under the particular enactments of different states, such as California and Pennsylvania, are inapplicable here.

In California an election may be contested by any elector, and " the court must be governed in the trial and determination of such contested election, by the rules of law and evidence governing the determination of questions of law and fact, so far as the same may be applicable: Codes of Cal., vol. 2, secs. 11,111–11,122.

In other words, the general law governing other actions are expressly made applicable to this special proceeding, so far as applicable.

In Pennsylvania the statute, as appears in *Boileau's Case*, 2 Parsons, 503, cited in Brightley's Leading Cases on Elections, p. 268, required the court to proceed " upon the merits " of the election, but this is not held to mean that the pleadings are not to be considered.

In *Kneass's Case*, Brightley, 338, *et seq.*, which seems to be much relied upon by appellant, the Court of Quarter Sessions, Philadelphia, simply held that under their statute there was nothing to prevent the exercise by the trial court of the common law discretionary power of permitting amendments under certain circumstances.

Such is not the case under our statute, which we are justified in saying stands unexcelled among the many similar

enactments, not only for clearness and simplicity, but for wise precautions against frauds and partisan manipulations.

While the fullest opportunity is afforded both parties for the vindication of their rights, the delays and subterfuges by which justice is so often defeated, are effectually prevented.

It was not intended to, and does not, leave anything to the "discretion" of the court, and in this respect, it profits by the universal experience of mankind as expressed in the often quoted language of Lord Camden cited in the note to *Kneass's Case, supra.*

"Any material fact alleged in the notice of contest not specifically denied by the answer, within the time aforesaid, shall be taken and considered as true."

No precedent can be found among the most extreme instances of judicial legislation, for pretending that this language is merely directory, and not mandatory. The words, "within the time aforesaid," were wholly unnecessary unless for the express purpose of limiting the time, and where the legislative purpose appears in the act, no court has ever gone to the extent of disregarding it. The widest latitude allowed is that "when statutes direct certain proceedings to be done in a certain way, or at a certain time, and a strict compliance with these provisions of time and form does not appear essential to the judicial mind, the proceedings are held valid, though the command of the statute is disregarded:" Sedg. on Stat. Law, p. 368.

And this is only when the language used fails to enjoin a strict compliance, and when the requirement relates to some immaterial matter, where a compliance is a matter of convenience rather than of substance:" *The People v. Schermerhorn*, 19 Barb., 540; Sedgwick, p. 374.

Of course the provision of the civil procedure act in regard to amendments of pleadings in actions generally do not apply to this special proceeding. It is complete in itself.

We might well submit this point, upon the plain proposi-

tion that the court, in refusing leave to amend the answer, was simply acting in obedience to the law.

But even if the court had possessed either the statute or common-law power of permitting the amendment in question, there can be no possible doubt that the exercise of the power was a matter resting in the sound discretion of the trial court, which this court will not review.

The case in Pennsylvania cited by appellant is conclusive upon this subject. The court says: " From these and many other authorities which might be cited, it is well settled that amendments not regulated by the act of 1806 must be granted or refused under the exercise of a sound discretion of the court, for the furtherance of justice, and is not the subject of revision by a higher court; in short, it is an appeal to the conscience of a judge :" *Kneass's Case*, 2 Parsons 553 ; *Harrison v. Colton*, 31 Iowa, 16; *Bloom v. Price*, 44 Miss., 73 ; *Mott v. Mustian*, 43 Ga., 380 ; *Clark v. Spencer*, 14 Kan., 398; *Culvet v. Hide & L. Bank*, 78 Ill., 625 ; *Cross v. Johnson*, 30 Ark., 396 ; *Scarlett v. Academy*, 43 Md., 203 ; *Dobson v. Chambers*, 78 N. C., 334 ; *Reid v. Allen*, 18 Tex., 241 : *Forrest v. Forrest*, 25 N. Y., 501 ; *Phincle v. Vaughan*, 12 Barb. (N. Y.), 215 ; *Sayre v. Frazer*, 46 Barb. (N. Y.), 26 ; *Walden v. Craig*, 9 Wheaton, 576 ; *Mandeville v. Wilson*, 5 Cranch, 15 ; *Church v. Syracuse*, 32 Conn., 372 ; *Schermerhorn v. Wood*, 30 How. (N. Y.), Pr., 316 ; *Moore v. Shaw*, 47 Me., 88 ; *United States v. Buford*, 3 Peters, 12 ; *Ensworth v. Barton*, 67 Mo., 622.

If the court should go farther, and wish to review the action of the court below, we respectfully refer to the record to show that, so far from the refusal of leave to amend being an abuse of discretion, permission, if given, would have been a gross outrage upon the contestant, and would virtually have deprived him of his rights under the law.

It will be seen that leave was not asked until February 17, 1881 ; this was fifty-five days after the answer was filed—

forty-eight days after the reply had been filed and served, calling specific attention to the omission—and forty-eight days after the period of taking testimony had commenced'to run, which was limited by law to three months, or ninety days. Contestant was not bound to take evidence on this point before: *Moore v. Sanborin,* 42 Mo., 490.

Of course the effect of the amendment would have been to require proof on the part of contestant as to the residence of these sixty-nine voters, and to deprive him of the time which had elapsed, and which the law gave him ; and in support of this application the respondent filed no affidavits and furnished no excuse for their delay which could be considered by the court.

Assuredly the court, under such circumstances, exercised a most sound discretion in refusing an application which would have enabled the respondent, by means of his own laches, to deal the contestant so fatal a blow.

BRISTOL, Associated Justice: The above three contested elections cases for the respective offices of sheriff, treasurer and judge of probate, are here by appeal from the third judicial district court for the county of Doña Ana.

Over seventy cases of illegal voting on various grounds are alleged by each of the contestants, and between two hundred and three hundred by each of the respondents.

The testimony is very voluminous, each alleged ground of illegality in voting presents a separate and distinct issue to be ruled upon. I will consider the several cases together without reference to the testimony taken before the master, except so far as may be necessary for a final disposition of the case.

The official returns of the judges of election for each of the precincts in the county are in evidence.

From these returns it clearly appears that the contestant, Thomas J. Bull, for the office of sheriff, received two more

votes than the respondent, James W. Southwick. That the contestant, John D. Barncastle, for the office of treasurer, received nine more votes than the respondent, Martin Amador, and that the respondent, Maximo Casteñada, for the office of probate judge, received twelve more votes than the contestant, Evangelisto Chaves.

Casteñada having received a majority of votes, very properly received his certificate of election from the canvassing board.

This same canvassing board, however, refused to issue certificates to either Bull or Barncastle, but instead thereof gave certificates of election to the minority candidates, Southwick and Amador.

Why was this ?

There is nothing before me to clear up this mystery, except certain undisputed facts in relation thereto, appearing on the face of the pleadings, and the official returns of the judges of election of the several precincts.

The notice of contest for the office of sheriff, among other things, contains the allegations substantially, that the judges of election of precinct No. 2, returned to the canvassing board for the contestant, Bull, sixty-four votes; that of said votes the canvassing board unlawfully, designedly and fraudulently neglected and refused to canvass and count for the contestant one of said votes.

Also that the judges of election of precinct No. 8, returned to said canvassing board forty votes for said contestant, Bull; that of said votes the canvassing board unlawfully, designedly and fraudulently neglected and refused to canvass and count for the contestant two votes.

And also that the judges of election of precinct No. 9, returned to said canvassing board nineteen votes for the contestant, Bull ; that of said nineteen votes the canvassing board unlawfully, designedly and fraudulently neglected and re-

fused to canvass and count for the contestant each and every one of said votes.

The respective notices of contest for the offices of treasurer and probate judge contain the same allegations as to the return of votes from precincts Nos. 2, 8 and 9 respectively, except that for treasurer.    Barncastle received sixty-six votes in precinct No. 2, and forty votes in precinct No. 8.    Also that the contestant, Chaves, received sixty-seven votes in precinct No. 2, and thirty-nine votes in precinct No. 8.

The answers of the respective respondents to these allegations are somewhat peculiar, and deserve especial notice. Each of these answers is to the same effect, and one will answer for all.    I will take that of the respondent, Amador, for office of treasurer as a sample.    He denies generally :

" That the said county commisioners failed at any time or neglected or refused to count, canvass, or allow for said contestant the full number of votes returned as having been cast for him, said contestant, at said county for said office of treasurer, and denies that said commissioners as a canvassing board at the canvass of returns of said election did wrongfully, unlawfully or fraudulently neglect or fail or refuse or omit to count, canvass and allow you, the said contestant, for said office of treasurer twenty-two votes or any number whatever which appeared from said returns to have been received by said contestant for the said office of treasurer ; and he, said respondent, denies that at said canvass of the election returns of said election for said office of treasurer the commissioners unlawfully or fraudulently or without sufficient cause threw out or refused to consider or canvass the returns of precinct No. 9 of said county, or to in any manner deprive him, said contestant, of nineteen votes or any vote or votes whatever. This respondent denies that the county commissioners sitting as a canvassing board as aforesaid, ever at any time wrongfully or fraudulently or in violation of law, did omit or fail or neglect or refuse to count and canvass and allow for said

contestants the full number of votes returned as having been cast and counted at precinct No. 8, or any other precinct of said county at said election for said office of treasurer ; and denies that said contestant was by said commissioners then and there as aforesaid deprived of the benefit of any votes whatever, which or any of which had been lawfully cast, counted or returned for said contestant at said election for said office of treasurer.

" This respondent avers the fact to be that at the election aforesaid at precinct No. 2, the vote of Adolph Lea was received by the judges of election at said precinct, which vote was illegal and not entitled to be cast, canvassed or counted ; the said Adolph Lea not then being registered at said precinct, nor having a certificate of registration as required by law.

" And that at precinct No. 8, aforesaid, the votes of Atanacio Rivera and Senobio Nevares, were each and both received by the judges of election at said precinct; which votes and each of them were illegal ; they, the said Atanacio Rivera and Senobio Nevares, and each of them not then and there being citizens of the United States, and not then and there being registered as voters as provided by law ; and this respondent charges and specifies that the votes of said Adolph Lea and of Atanacio Rivera and Senobio Nevares, and each and every one of them so illegally voted and received, were voted for you for said office of treasurer, and wrongfully attempted to be counted for you, said contestant.     *     *     *

" And " (this respondent) " avers the fact to be that the returns and papers to wit : poll books and registration lists of said precincts, to wit : precincts Nos. 2,     *     *     *     8 and 9 respectively,     *     *     *     show that at precinct No. 2 aforesaid, John D. Barncastle received but sixty-five votes     *     *     * at said precinct No. 8, John D. Barncastle received but thirty-eight votes, at said precinct No. 9, John D. Barncastle received no votes."

Answers substantially the same were made to these allega-
tions in the notices of contests for the offices of sheriff and
probate judge by the respective respondents, Southwick and
Casteñada, with the exceptions of the averments in the answer
of Southwick that Bull received but sixty-three votes in pre-
cinct No. 2, and but thirty-eight in precinct No. 8; and in
the answer of Casteñada that Chaves received but sixty-six
votes in precinct No. 2, and but thirty-seven in precinct
No. 8. The logic, significance and effect of these several
answers to the allegations under consideration, are virtual
admissions that the canvassing board threw out one vote for
the contestants from precinct No. 2, also two votes from pre-
cinct No. 8, and the entire returns from precinct No. 9,
accompanied, however, by the general denial that this was
done unlawfully or fraudulently.

That in precinct No. 2, one vote, that of Adolph Lea, was
received by the judges of election for the respective contes-
tants, and counted and returned by them as such to the can-
vassing board; but, as is claimed by the respondents, such
vote being an illegal vote, was no vote, and being no vote,
the several contestants received in that precinct one vote less
than the number returned by the judges of election, and on
that ground the canvassing board canvassed and counted for
the contestants one vote less from that precinct than was re-
turned by the judges of election.

That in precinct No. 8, two votes, those of Atanacio
Rivera and Senobio Nevares, were in like manner received
by the judges of election for the respective contestants, and
counted and returned by them to the canvassing board as
legal votes, but such votes being illegal were not votes, and
not being votes, the contestants received in said precinct No.
8, two votes less than were returned by the judges of elec-
tion, and therefore the canvassing board canvassed and
counted for the contestants two votes less than were so
returned.

And that in precinct No. 9, neither of the contestants received either nineteen or any votes whatever—and therefore none were or could be canvassed and counted by the canvassing board for either of the contestants.

That is to say, the canvassing board usurped the functions of the judges of election and assumed the powers of a judicial tribunal—in the absence of the parties interested—to decide and determine the legality of the vote of Adolph Lea in precinct No. 2, as also the legality of the votes of Atanacio Rivera and Senobio Nevares in precinct No. 8.

The returns from precinct No. 9 by the judges of elections certainly show that nineteen votes were cast for each of the contestants. These returns in every respect are in strict conformity to the requirements of the statute, except that the printed form of the oath to be taken by the judges of election is not filled up and signed by them, nor is there any evidence appearing thereby that they took such oath. It may be fairly assumed, therefore, that the only ground on which the canvassing board and the respondents considered or pretended that neither of the contestants received any votes at all in precinct No. 9, is that the judges of election thereof did not take and subscribe the oath required by law, and therefore, in consequence of that omission, all the votes cast in that precinct were illegal, and being illegal, were not votes, and were not and ought not to be counted or canvassed by the canvassing board. In this instance, also, the canvassing board assumed the functions of a judicial tribunal to pass upon the legality of the votes cast in precinct No. 9.

Long before these answers were put in by the respondents, these same questions came before me in a *mandamus* proceeding instituted to compel this canvassing board to canvass and count for one of these contestants said nineteen votes so thrown out by them from precinct No. 9; also said two votes from precinct No. 8, and the one vote from precinct No. 2, so thrown out by them.

There were various delays in consequence of the case not being properly presented with all the facts, but it was finally presented with all the returns and data that were before the canvassing board, and upon which they based their action in the premises, and all these questions arose upon a motion to quash the alternative writ of *mandamus*.

The law was carefully considered, precedents and authorities were cited and read. The motion to quash was overruled, and the canvassing board ordered to canvass and count said votes or show cause to the contrary by a certain day. An evasive return was put in, which was quashed and the board ordered to file a proper return by another day. In the meantime, the board went out of office and a new board became their successors, and the case was never pressed for a final determination.

On the motion to quash the alternative writ of *mandamus*, all the questions were ruled upon. It was then decided that the canvassing board had only ministerial functions to canvass and count the votes as returned by the judges of election, to ascertain and declare the respective majorities of votes received by the respective candidates for office from the aggregate number of votes so returned by the judges of election. That they had no judicial powers whatever to pass upon and decide as to the illegality of individual votes received and returned to them by the judges of election, and particularly so as to precinct No. 9. That the judges of election of that precinct, notwithstanding they may not have taken and subscribed the oath as required by statute, were nevertheless *de facto* judges of election, and their official acts otherwise regular, were entitled to full faith and credit; and that their omission to take such oath, while it might render them liable to prosecution and severe penalties, could not in any way affect the legality of votes received and returned by them; and that it was the duty of the canvassing board to

canvass and count all such votes for the respective candidates
for whom they were cast.

In making these rulings, I simply followed the uniform
decisions of the courts on the subject. I had not then, nor
have I now, any doubts as to their correctness. Each of
these respondents in their answers has substantially reiterated
the same grounds so ruled against, in justification of the acts
of the canvassing board in throwing out the returns from pre-
cinct No. 9; one vote for the contestants in precinct No. 2;
and two votes in precinct No. 8.

In precinct No. 9, nineteen votes were cast for each of the
contestants, eleven for each of the respondents. By throw-
ing out the returns from this precinct by the canvassing
board, the result of the election, as shown by the returns, was
changed so that the contestant, Bull, instead of having a
majority of two for the office of. sheriff, his competitor,
Southwick, had a majority of six. And the contestant, Barn-
castle, instead of having a majority of nine votes for the office
of treasurer, had only one majority. And the respondent,
Casteñada, instead of having a majority of twelve for the
office of probate judge, had a majority of twenty; and by
throwing out one vote for each of the contestants in precinct
No. 2, and two votes in precinct No. 8, the result of the elec-
tion, as shown by the returns of the judges of election, was
further changed so as to give Southwick, for sheriff, a major-
ity of nine; to Amador, for treasurer, a majority of two, and
to Casteñada, for judge of probate, a majority ·of twenty-
three.

This then, is the explanation, and the reason why South-
wick received from the canvassing board the certificate of
election for sheriff, instead of Bull; and why Amador re-
ceived the certificate of election for treasurer instead of Barn-
castle.

The powers and duties of the county commissioners as a

canvassing board are clearly and specifically defined in the ninth subdivision of section 4, of the act of 1876.

The provision of the act is as follows:

"Said board of commissioners shall" * * * "also act as boards of canvassers of the elections within their respective counties; and shall count the votes cast in any election within their respective counties, and shall determine the result thereof from the returns of the judges of election of the various precincts, and shall declare the result of said election, and shall immediately issue a certificate to the person that may have received the highest number of votes for any office." * * * "The votes cast in any election shall be canvassed and counted within the time now prescribed by law, and the said board of commissioners shall discharge all the duties, and shall exercise all the powers now exercised by the several probate judges, relative to elections, as now required by law, and shall be subject to the same penalties for any failure in the discharge of their duties, or abuse or usurpation of power:" *Vide* laws of N. M., by Prince, chief justice, page 226, sub. 9, sec. 14. This law is concise and plain. Whatever votes have passed the judges of election, and received by them as votes, and as such returned by them to the canvassing board as having been cast for certain candidates respectively—the returns showing in an intelligible manner the number of votes and for whom cast—it becomes the ministerial duty of the canvassing board to count all such votes, and declare the result from such returns alone, without sitting as a court of review—in the absence of the parties interested—for the purpose of passing upon the illegality or legality of individual voters, whose votes have been so returned to them.

But it was suggested by one of the counsel for respondents, that at and previous to the date of the act creating county commissioners and conferring upon them the powers of a canvassing board and of probate judges in regard to elections,

the judges of probate did possess some sort of judicial power to determine the illegality of votes at the time the returns were canvassed ; and that under the provisions of the statute last above quoted, the canvassing board could exercise the same functions in determining the illegality of voters.

The only provision of statute at any time in force, on which any such suggestion could be based is contained in the act of July 20th, 1851, which provides as follows :

" Within six days after the election, the probate judge shall call to his assistance one of the justices of the peace of the county, and publicly examine the votes polled for each candidate, giving notice thereof two days previous, which notice shall be posted up at the court house for the in_ formation of the people where the examination is to be held,. and any citizen shall have the right to question the legality or illegality of any vote :" Laws N. M., Prince's ed., sec. 17, p. 328.

Whatever significance may be given to this statute, it certainly never conferred the power on the canvassing officers to determine the illegality of votes and to reject them on that ground, for section 55 of the same act specifically prescribes the mode in which the illegality of votes shall be determined and the votes rejected. That section provides as follows :

" To reject any illegal votes that may be polled at any election in this territory it shall not be necessary to contest or question them at the polls, but they may be rejected by the authorities qualified by law to determine the validity of said elections, by being proved, after due notice is given by the party contesting said election to the opposing party ; said notice in any county election shall not be less than eight days, and shall, in all cases be within thirty days thereafter :" Laws N. M., Prince's ed., sec. 55, p. 333.

This, then, was the only mode by which illegal votes received and returned by the judges of election could be deter-

mined and rejected under the former administration of the probate judges; and that mode certainly was not to be executed by the canvassing officers at the time the returns from the several precincts were canvassed by them.

It is a well authenticated fact that one of the most disgraceful episodes in the history of the politics of this same county was, some years ago, enacted by a judge of probate and justice of the peace, acting as a canvassing board under the supposed authority of sec. 17 of said act of 20th July, 1851.

As such board of canvassers, they assumed judicial power to pass upon the illegality of and reject votes without any other ceremony than because partisan bystanders challenged them as illegal.

In this way hundreds of votes were thrown out and the result of the election thereby arbitrarily changed. This is but another illustration of what experience has long since demonstrated, which is, that if such judicial power should be conferred upon mere canvassing boards, to be exercised at the close of a hotly contested election—in the absence of the real parties interested, and almost always with the partisan advisors of such boards in the background—their sittings would be marked by the exercise of arbitrary power that would be more aggressive and odious than that of the ancient court of Star Chamber.

After votes have been received and regularly returned by the judges of election, and questions as to the illegality of any such votes shall subsequently be raised, the respective candidates for whom such are cast are, on principle and as a matter of law, as much entitled to their day in court and to be heard thereon before such votes are rejected, as are the litigants in any other form of judicial proceeding.

The only lawful tribunal having original jurisdiction to determine questions of this kind is the district court: Act of 1874, Prince's Laws N. M., 344.

The only mode by which such questions can be determined

by the district court in a proceeding between rival candidates alone, is that prescribed by the act of 1876: Prince's Laws N. M., 134.

For the reasons assigned it is clearly my opinion, as a matter of law that the canvassing board, wrongfully and without authority of law, issued certificates of election to Southwick and Amador; that such certificates ought to have been issued to Bull for sheriff, and to Barncastle for treasurer; that by reason of said certificates so as aforesaid wrongfully issued, the respondents, Southwick and Amador, have improperly held the respective offices in question, pending the termination of these contested election cases; that in the meantime, though said respondents have been such officers *de facto*, and their official acts entitled to full faith and credit as such, yet they have not been such officers *de jure*.

I have gone over this branch of the case very much in detail and as thoroughly as I was able, because the questions involved are really important, and have not, to my knowledge, ever been ruled upon by our courts. If there is any misapprehension in the minds of canvassing boards as to their precise powers and duties, it is of the greatest importance to the public, as well as for their own protection against severe statutory penalties, that the matter should be settled and determined by the courts.

There is another branch of the cases, bearing upon certain duties of judges of election, that is of sufficient importance to merit some attention.

The judges of election of precinct No. 3 returned 114 votes for the respondent, Southwick, for sheriff, and 58 for the contestant, Bull; also 114 votes for Amador for treasurer, and 54 for the contestant, Barncastle; also 129 votes for the respondent, Casteñada, for probate judge, and 40 for the contestant, Chaves; all the respondents receiving large majorities.

In each of the notices of contest for the respective offices

Bull v. Southwick.

in question there are allegations, substantially, that the returns and poll books of this precinct show upon their face that they are so contradictory, unreliable, defective and tainted with fraud as to render them entirely worthless as election returns, because :   1st. It cannot be determined from said returns and poll books, with any degree of certainty, how many or what particular persons voted thereat for said officers respectively.   2d. Because the numbers written respectively on the tickets voted thereat do not conform to the respective numbers set opposite the names of voters on the poll book. 3d. Because the whole conduct of the election officers who held said election at precinct No. 3, then and there amounted to such a disregard of their official duties as to render their doings unintelligible and unworthy of credence, and the results of their action unreliable for any purpose.  4th. Because it appears from the poll books of said precinct that S. H. Newman voted for each of said respondents for the said respective offices for which they were candidates, whereas, in truth and in fact, said Newman did not vote at said precinct at all, and did not vote at said election for either of the respondents.   5th. Because it appears from the poll book that one Jacinto Armijo then and there voted for the respondents, Southwick and Casteñada, and for the contestant, Barncastle, whereas, in truth and in fact, he did not then and there so vote. 6th. Because it appears from said poll book that one S. M. Blun voted for each of said respondents, whereas, in truth and in fact, he did not so vote ; and, 7th. Because it appears from such poll book of precinct No. 3 that S. B. Newcomb and Wm. L. Rynerson voted at said precinct at said election, whereas, in truth and in fact, neither of them then and there voted.

In response to these allegations the respective respondents in their answers deny all fraud, negligence and irregularity on the part of the judges of election of this precinct.

As to the allegations in regard to the voting of S. H.

Newman, Jacinto Armijo and Wm. L. Rynerson, they simply deny that they, or either of them, at said election, voted at said precinct; thus virtually admitting the allegations in respect thereto contained in the notices of contest.

There is no answer to the allegations in regard to the voting of S. B. Newcomb and S. M. Blun—which allegations are of course admitted.

In further answer to such allegations the respondents aver that the county clerk, Horace F. Stephenson, a strong partisan of the contestants, wilfully, corruptly and fraudulently neglected and refused to deliver the poll books and ballot box of said precinct to the judges of election thereof, for the purpose of obstructing and preventing a full and fair election thereat; and that he left the same locked up in his office on the morning of the day of said election, and absented himself, so that said poll books and ballot box could not be obtained at the time for opening the polls for said election, nor were they obtained until the doors of his office had been forced open, when they were conveyed to said judges of election.

In further response to said allegations they aver that any irregularity touching said returns from precinct No. 3 was the result of said action on the part of said Stephenson. They further aver that by the numbers on the ballots and the numbers opposite each voter's name on the poll books it can be determined by whom and for whom each and every ballot was cast.

Now, it is apparent from an examination of the returns of this precinct, that in some respects either these returns are false, or these answers are false. For instance, these answers aver that said S. H. Newman, Jacinto Armijo and W. L. Rynerson did not, at said election, at said precinct, vote in any manner whatever; whereas the judges of election thereof certainly recorded in the poll books and returns that said S. H. Newman did vote thereat ballot numbered 161, for each

of the respondents; also that said Jacinto Armijo thereat voted ballot numbered 3, for each of the respondents, Southwick and Casteñada, and for the contestant, Barncastle; also that said W. L. Rynerson voted ballot numbered 183, for no candidate whatever; that is to say, he voted a blank ballot so numbered. These poll books and returns further show that said S. M. Blun voted thereat ballot numbered 41, for each of the respondents, and that S. B. Newcomb voted ballot numbered 160, for Manuel Nevares, for justice of the peace, and for no other candidate.

But the returns from another precinct (No. 10), show that thereat, at said election, said S. B. Newcomb voted ballot numbered 3, for each of the respondents, on a certificate of registration from precinct No. 3; also that the returns from precinct No. 18 show that W. L. Rynerson voted thereat ballot numbered 112, for each of the respondents, on a certificate of registration from said precinct No. 3.

On examining the poll books and returns from this precinct, No. 3, the first thing that must impress anyone as extraordinary and incredible is the fact that, according to such returns, all the voters at said precinct marched to the polls and voted in alphabetical order.

That is, all those voters whose surname commenced with the letter "A"—thirty-nine in all—voted before anyone else with names commencing with any other letter voted. Those voters under the initial "A" are recorded as having voted ballots numbered from and including ballot numbered 1, to and including ballot numbered 39, in regular numerical order.

After these had all voted, then all those voters, the initial letter of whose surnames was "B," voted in regular numerical order ballots numbered from and including ballot numbered 40, to and including ballot numbered 60—twenty-one in all. Then, in like manner, all those under the initial "C" voted, and then those under the initial "D," and so on through

the entire alphabet in regular numerical order, until the initial "Q" is reached. The "Qs" commenced with ballot numbered 175. One voter, the first under this initial—one Jesus Quesada—is recorded as having voted that ballot. Those under the remainder of this initial "Q," and extending through the initials R, S, T, U, V, W and Y, in regular alphabetical and numerical order—fifty in all—from and including ballot numbered 176, to and including ballot numbered 225, are recorded as having voted blank ballots.

The law in regard to making out these poll books and returns is very plain and simple. The statute has not only prescribed the mode, but has prescribed a form for executing that mode. The judges of election of precinct No. 3 had one of these forms in print, with appropriate columns marked and with suitable headings, also in print, indicating precisely how the poll books and returns should be made out.

The mode and form prescribed by law is as follows : The ballot of the first voter appearing at the polls and voting is to be numbered one by the judges of election. The same number is to be put down by them in the poll book, and opposite the same number, in the proper column therein, is to be written the name of such voter. The ballot so numbered is then deposited in the ballot box.

The ballot of the second voter appearing and voting is to be numbered two, and the same number put down in the poll book next in order after No. 1, and the name of the voter voting that ballot so numbered is to be written down opposite that number in the poll book, and the ballot then deposited in the ballot box.

The same numerical order and record are to be observed and kept with each voter as he appears and votes.

At the close of the polls the names of the respective candidates voted for by each ballot so numbered and recorded are to be written down in the appropriate columns, and in the proper column under the name of each candidate so voted

for, and opposite the same number in the poll book which the ballot bears, and opposite the name of the voter voting the same, is to be recorded the vote, showing that the voter has cast one vote for each candidate so voted for by him.

The poll books of the several precincts with the proper certificates attached and so filled out, constitute the returns of the judges of election to be transmitted to the canvassing board.

With these printed forms of poll books and returns before them, what excuse was there for the judges of election of this precinct to make out false returns as to who voted and how they voted? If the clerk, Stephenson, was guilty of the charges alleged in the answers, he certainly merits the severest censure, and ought to be prosecuted for gross breach of duty.

But I am unable to perceive how this breach of duty, under the circumstances, could be the occasion for or constitute any justification for making out a false return in any respect. The judges of election could not proceed without the ballot box and poll books. There may have been some delay in procuring them. But it seems they did procure them and proceed with the election. They had the legal forms before them. They filled out these forms in a certain illegal mode, so as to bear falsity on their face in the respects I have pointed out.

It is quite clear that it cannot be ascertained from the poll books and returns of this precinct how or for whom or what ballot any voter voted, nor are they in and of themselves any evidence that can be relied on that any of the persons whose names are recorded in the poll books and returns voted at all, and that to determine this matter a resort must be had to evidence *aliunde.*

In these answers it is averred that from the ballots cast at this precinct the number of votes for each candidate may be determined. That may be true, but the ballots sealed up

and locked up in the ballot box and deposited for safe keeping pending any election contest that might be instituted, constitute no part of the returns of the judges of election to be canvassed by the board of canvassers.

The contestants complain—and I think justly—that in consequence of the falsity of the returns from this precinct, in recording the names of votes opposite the numbers of ballots which they did not vote, it was impossible for them to ascertain therefrom what illegal votes, if any, had been cast for the respondents, and that thereby they were prevented from including any such illegal votes in their notices of contest. If this was designed, it was certainly a fraud.

Whether designed or not, it was an infringement of the rights of candidates desiring to contest the election.

Whether there was or was not any fraud committed at this precinct, one thing is quite certain, and that is, that by reason of the falsity of the returns that I have pointed out, the door was opened whereby the grossest frauds might have entered, and the greatest obstacles thrown in the way of their detection.

The notices of contest for the respective offices of sheriff and treasurer were duly served on the respective respondents, Southwick and Amador, on the fourth day of December, 1880, and the notice of contest for probate judge was served on the respondent, Casteñada, on the seventh day of December, 1880.

The provisions of statute under which the cases are brought, so far as they relate to the question involved, are as follows:

" In all cases of contested elections triable in the district court, the notice of contest when filed and served as now provided by law, shall be taken and considered as the only petition and process necessary for the court to acquire jurisdiction."

" The respondent shall file his answer to the notice of con-

test within twenty days from and after the service of such notice of contest upon him exclusive of the day of such service; and any material fact alleged in the notice of contest, not specifically denied by the answer within the time aforesaid, shall be taken and considered as true."

" The respondent may allege in his answer any matter material to the issue, showing that the contestant is not legally entitled to the office in controversy; and if he claims that illegal votes have been cast or counted for the contestant, he must specify in his answer the name of each person whose vote was so illegally cast or counted, the precinct where he voted, and the facts showing such illegality."

" The contestant shall file his reply to any new matter set up in the answer, and serve a copy thereof on the respondent within twenty days from and after the service of the answer, exclusive of the day of such service; and any new matter in the answer material to the issue not specifically denied by such reply within the time aforesaid, shall be taken and considered as true :" Act 1876, Prince's General Laws N. M., 344–5.

Under the foregoing provisions of law, the time for answering and specifically denying each material allegation in the respective notices of contest for the offices of sheriff and treasurer, and filing and serving the same expired at the end of the 24th day of December, 1880, and the time for so answering and denying the allegations in the notice of contest for probate judge, and filing and serving the same expired at the close of the 27th day of December, 1880.

Each of the notices of contest contained allegations that sixty-nine voters, naming them and the precincts where they voted, voted at said election for each of the respondents.

That each of said voters was not qualified to vote, on the ground, among others, that he had not resided in said county for three months immediately preceding the election.

These allegations, of course, are material, and if true rend-

ered the vote of each of said voters illegal and void ; and whatever the number of illegal votes the testimony may show were cast for the contestants, it is clear they are insufficient in numbers to overbalance these sixty-nine alleged illegal votes for respondents ; and that if these allegations are to be considered as true, then it necessarily follows that each of these cases must be decided in favor of the contestants, Bull, Barncastle and Chaves.

The respondents, Southwick and Amador, filed and served answers on the 24th day of December, 1880, that being the last day on which the same could be done. But in neither of said answers is there any denial of any of the aforesaid allegations as to the illegality of these sixty-nine votes.

The respondent Casteñada, filed an answer on the 27th of December, 1880, that being the last day for such filing ; but such answer was not served until the expiration of the time for such service, to wit: on the 22d day of that month. Neither does this answer contain any denial of the aforesaid allegations touching the illegality of said sixty-nine votes.

On the 17th day of February, 1881, fifty-nine days after the expiration of the time for Southwick and Amador to answer, and fifty-two days after the time expired for Casteñada to answer, each of the respondents made a motion for leave to file a supplemental answer denying the allegations as to the illegality of said sixty-nine votes, a proposed supplemental answer being attached to the motion in each case.

These motions were set down for hearing on notice to opposing counsel on the first day of February, 1881.   A hearing was had on that day—all the parties appearing by counsel, and the application for leave to file such supplemental answers was denied and overruled by the court.

Nothwithstanding this ruling, the respondents, under objection by contestants, have taken testimony before the master, tending to show that said sixty-nine voters had been residents of the county for three months prior to the election.

Bull v. Southwick.

This testimony has been reported by the master. On the final hearing of the causes, the respondents renewed their motions for leave to file said supplemental answers, for the purpose of having the pleadings conform to the evidence. These motions also, were overruled by the court, and excepted to by respondents.

It is my opinion that this evidence was improperly taken, and ought not to be considered; the same not being responsive or pertinent to any issue in either of the cases.

It is also my opinion that the very object of the statute, in regard to the pleadings and practice in contested election cases, is to afford, and at the same time to compel the observance of, a speedy mode for conducting and terminating such cases. Its language is plain and free from all ambiguity. There is no room for mistaking its purport and meaning, and I cannot conceive of any reasonable excuse for not following its provisions by either party.

These statutory provisions, as to the time of filing and serving the notice of contest, answer and reply, are in effect statutes of limitation, taken from the judge all discretion as to extending the time.

In my opinion this is one of the most salutary of our statutory laws. Experience has demonstrated that without some such compulsory mode as to the time of making up issues and their trial in contested election cases, subterfuges and delays might, and would be successfully resorted to, so that a final determination could not be reached before the term of office would expire.

At the time the motions for leave to file the supplemental answers were made and heard, no excuse whatever was presented for the delay, nor was any excuse at any time offered, except the negligence and oversight of counsel for the respondents.

If any error was committed by the court below in the premises, it was in overruling the motions in the first instance.

After such ruling, the contestants and their counsel had a right to consider that issue disposed of, and were excused from offering any evidence in support of their allegations.

Nevertheless it was claimed by respondents' counsel on the argument of the cases, that inasmuch as the people were interested in securing the officers of their choice, the contestants were bound to prove those allegations, though not denied by the answers.

In reply to this, it may be said, 1st, that it is absurd to introduce evidence to prove the truth of what the law declares "shall be taken and considered as true;" 2d, that this is a proceeding exclusively between rival candidates for office, in which the people in no sense are parties.

That it is competent for an officer to resign—to admit facts that will deprive him of an office and give it to another in a proceeding between them—or by his own negligence in conducting his defense, to produce the same result, there can be no doubt.

If by any such means the candidate should obtain the office, who, in fact, was not elected in a majority of legal votes, and this could be shown by competent evidence, the people would have their remedy in a direct proceeding on their part, by writ of *quo warranto*. And if successful, while it would not restore to office the candidate who had lost it by his own act or omission, it would oust the other candidate. Both would then be out of office, and the vacancy could be filled in the mode prescribed by law.

The theory of our statute in regard to the institution and prosecution of contested election cases between rival candidates undoubtedly is, that such candidates, being personally interested and desirous of obtaining and holding the office in question, will do all that is necessary to secure their respective rights under the law.

It must be conceded that this statute, when followed by the parties, affords a speedy, consistent and effectual rem-

edy, whereby the rights of the parties, as well as the interests of the people, are well protected.

It is clear, however, that this statutory remedy does not supersede the proceeding by writ of *quo warranto*, on behalf of the people. It is also clear that under this statutory remedy no act or omission by either party can jeopardize the rights of the people, and if by any such act or omission the wrong candidate should obtain office, the people could resort to their remedy by *quo warranto*.

This statutory proceeding between rival candidates alone is a special proceeding complete in itself, conferring a special jurisdiction on the district court, and to which the general law and rules of the court as to the time of pleading and the discretion of the district judge in extending such time, do not apply.

The special proceeding, therefore, must be strictly followed. It is so plain that there can be no excuse for not following it. When followed, no occasion can ever arise for resorting to a writ of *quo warranto*.

From the opinion herein expressed, it follows that the record discloses no error, and that the judgment of the court below in each of these contested election cases ought to be affirmed.

PARKS, Associate Justice: Nearly a year since in a contested election case in my own district, I was obliged to examine and construe the statute which is in question in this. I then held that the law was mandatory, and have not found any reason in the argument or in the examination of this case to change my opinion.

The correct rule for the interpretation of such statutes is that "no specific requirement of a statute may be dispensed with except when it is clearly manifest that the legislature did not deem a compliance with it material, or unless it appears to have been prescribed simply as a matter of form." "If it is evident from the ordinary grammatical construction

of the words used that it intended a right should be enjoyed only upon some specified conditions, there is no power in the courts or elsewhere to dispense with the conditions imposed, or to hold that a thing which it deemed essential to be done at one time, may nevertheless be done at another."

It is insisted that the statute is directory and that the court had the right in its discretion to give the respondents time to amend their answer in a vital point or to extend the time for answering on one material point, which is substantially the same thing, and that the refusal of the court to do so was an abuse of its discretion. One and a sufficient answer to this is, that leave to amend the answer or to file an amended answer was not asked for till nearly eight weeks had elapsed after the time for answering had expired, and that a corresponding liberality in the court in the exercise of its discretion in all other respects, would defeat the manifest object of the law, which is a prompt and speedy trial of election contests. It is laid down in McCrary on the Law of Elections, that amendments should be immediate and for reasons too obvious to need statement here. If the district court had the discretion to permit amendments as claimed, that discretion must be reasonably exercised, and could not be extended so as to relieve the respondents in this case from the consequences of their long and unreasonable delay in asking leave to amend. The authorities cited on the argument were numerous, and many of them not applicable. Mr. McCrary's doctrine that election laws are only means to an end, is not applied by him and cannot be properly applied by anybody to the trial of contested election cases, and the eloquent opinion of the supreme court of Maine, quoting the still more eloquent speech of Mr. Lincoln, is subject to the same objection.

It is not intended to review these authorities. Many of them are profitable study, but none of them are conclusive of this case. It is the duty of the court to avail itself of all

such lights, but to use its own judgment in construing this statute and not permit it to be practically repealed by a construction not only too liberal to be wise, but too loose to be safe.

The opinion of the district court is filed with the record in this case, and is believed to be correct. It is so full and complete as to obviate any necessity there might otherwise be for a more lengthy and thorough opinion by this court.

The judgment of the district court is affirmed.

PRINCE, Chief Justice, dissenting: In the argument on the appeal in these cases it was agreed, in substance, that the question of fact relating to the legality of votes and eligibility of voters raised by the evidence should not be considered, but that the question as to the correctness of the ruling of the judge below in denying the application of the respondents for leave to amend their answer to the notice of contest, should alone be discussed. It was also stipulated by counsel that all of the three cases should be argued and considered together, as they were substantially the same, involving the same questions, and differing only in immaterial details. They will, therefore, be treated here as one case.

The judge presiding in the second district, who decided the appeal herein by affirming the decision of the court below, not having filed an opinion, and it being uncertain whether an opinion will be filed by Judge Bristol, it appears necessary, in order to lay a foundation for the proper understanding of the reasons which constrain me to dissent from the decision of the court, to recapitulate briefly the facts of the case.

At the general election, held in November, 1880, in the county of Doña Ana, James W. Southwick was declared elected sheriff over Thomas J. Bull, Martin Amador was declared elected treasurer over John D. Barncastle, and Maximo

Casteñada was declared elected probate judge over Evangelisto Chaves.

The provisions of the territorial statutes relating to contested election cases, so far as they relate to the time of pleadings, etc., are briefly as follows: The act of 1874 provides that the contestant shall file his notice of contest within 30 days after the day of counting the votes: Laws of 1874, chap. 29 (General Laws, p. 344). The act of 1876 provides that "the respondent shall file his answers to the notice of contest within thirty days from and after the service of such notice of contest upon him: Gen. Laws, chap. 26, sec. 2, p. 344. The contestant shall file his reply to any new matter set up in the answer, and serve a copy thereof within twenty days after the service of the answer: Gen. Laws, chap. 26, sec. 4, p. 345.

On December 1, the above-named candidates not declared elected, viz., Messrs. Bull, Barncastle and Chaves, filed notices of contest, and shortly after (December 4 on Southwick and Amador, and December 7 on Castenada), notice was served on the respondents to answer such notices.

These notices were similar in their character, each averring that a large number of illegal votes had been fraudulently and unlawfully cast, counted and returned for the respondents, praying the court that upon the trial of contest such votes should be stricken from the poll and disallowed, and alleging that when such illegal votes were thus subtracted from the number returned for the respondent, the contestant would be found to be elected by a substantial majority.

In the only one of the cases in which the full record is before me—that of Barncastle against Amador—the number of votes thus alleged to have been illegally cast and counted for the respondent is 71, but the number does not differ materially, if at all, in the other cases. For all practical purposes the cases are exactly similar.

It may be remarked here that only in four instances out of the 71 does the notice of contest give to the respondent any definite information as to the facts which it was claimed made the vote illegal.

In the case of Francisco Lucero, the allegation is that the voter had been convicted of a felony; in the case of Gregorio Miranda, that he was not a citizen; in the case of Rafael Abalos, that he was not a citizen and was also under age; in the case of Omogon Armijo, that he had not resided in the county and precinct for the required length of time; but in the other sixty-seven cases the allegation does not particularize any specific cause of disqualification whatever, but enumerates for each individual of the sixty-seven (using a uniform printed blank for the purpose), every one of the five disqualifications known to the law, viz. : that he was an alien, that he was under age, that he had not resided in the territory six months, nor in the county three months, nor in the precinct thirty days.

In no one out of the sixty-seven, so far as the record shows, and as is conceded as matter of fact, was this true; nor was any attempt made to prove it by evidence—the effect of such a kind of statement being, of course, to deprive the respondent of any information whatever as to the real issue to be met in the case of these sixty-seven voters. This was a flagrant and manifest evasion, if not violation of the law, the intention of which is to give the respondent precise information as to the cause of contest, and the objection raised to each vote, in order that he may be ready, in the required time, either to admit or deny the allegations. Such a vicious system of pleading, unless legally objected to, and the notice ordered to be made specific, could only be answered in one way to be effectual, and that was by denying, *seriatim*, the five allegations thus made as to each of the challenged voters.

On the 24th and 27th days of December, respectively, the

24

respondents filed their answers as required by the law of 1876, above cited.

These answers, so far as they relate to seventy of the seventy-one voters referred to in the notice.of contest (the one excepted being Francisco Lucero), are written on printed forms, the first portion of which reads as follows:

"This respondent denies specifically that at said election held on the said second day of November, A. D. 1880, for the said office of ——— at the said county of Doña Ana, and at, to wit, Precinct No. —, of said county, certain persons named in contestants' notice of contest, to wit, —·———, and each and every one of them were not then and there citizens of the United States or minors under the age of twenty-one years, and denies that they and each and every one of them had not resided in said territory for a period of six months immediately preceding said election, and denies that they and and each and every one of them had not resided in said precinct No. —, of said county, for a period of thirty days immediately preceding said election, and denies that they and each and every one of them were then and there disqualified by the laws of said territory from being registered as voters and from voting at the said election."

It will be observed that this specifically denies each allegation with regard to each voter, except that which states that he "had not resided in said county of Doña Ana for a period of three months immediately preceding said election."

The answer then goes on to charge that various illegal votes had been cast and counted for the contestant, using a printed blank for the purpose, and the charge in most cases in the same general and improper manner adopted by the contestant.

On the sixth day of January, 1881, the contestant filed and served his reply, in which, after specifically denying all the new matter in the answer, he says that "a certain material fact in and by said notice of contest, specifically alleged and

charged, to wit, that at said election so held at said county of Doña Ana, on the second day of November, 1880, for the the office of treasurer, certain persons, to wit: (naming them) did each and every one vote for the said respondent for said office of treasurer, and that they and each of them had not then and there resided in the said county of Doña Ana for a period of three months immediately preceding said election, is not by the said answer specifically denied or attempted to be denied," and, therefore, prays that said alleged fact be taken as confessed. On the seventeenth day of February, 1881, the respondent filed an amended answer, verified by Mariano Barela, containing the specific denial omitted in his original answer, and to the omission of which attention was drawn by the language just quoted from the reply of the contestant; with a motion for leave to file such amended answer. The judge set down the motion for hearing on February 21, at Chambers at Mesilla, where an extended argument took place, and the court, after consideration, overruled and denied the motion for leave thus to amend.

It is conceded that this decision was not made as an exercise of the discretionary power of the judge as to allowing amendments, but upon the distinct ground that the judge possessed no power or discretion in the matter; to use the language of the learned judge in his written opinion, that the statutory provisions " are really statutes of limitation taking from the judge all discretion as to extending the time." Counsel for the respondents stated in their argument on appeal that it was on account of the early announcement of this opinion of the judge, that they did not then present the affidavits which they had prepared, explaining the clerial error in their original answers and the reason for the lapse of time before their application to amend, which affidavits were only appropriate or useful if the subject was considered within the discretion of the judge.

An order of reference having been made, the respective parties thereupon commenced the taking of proofs before the master ; and in the course of the proceedings the respondent insisted on introducing evidence in support of the legality of the sixty-nine votes called in question by the notice of contest and affected by the omission of the clause as to ninety days' residence in the printed blank used by respondents in their answer.    This was objected to by the contestant on the ground that the respondent, by failing to deny the allegation of the notice as to the ninety days' residence of those voters, had admitted the truth of that allegation; that the fact thus alleged and not denied was under the law to " be taken and considered as true," and hence that the subject of the legality of those votes was settled, and not subject to be changed by proof.    The evidence as to the residence of these voters was then taken by the master, subject to the objection, and reported to the judge.

On the final hearing on the 1st of June, 1881, after the coming in of the master's report, the respondents again moved (having filed the motion, May 24), to be allowed to amend their answer by a denial of the allegation of non-residence, with a request that the amendment be filed *nunc pro tunc* as of the date of filing the original answer, when it was intended by said respondents' counsel to include in his said answer the substance and words of this said amendment." This was supported by the affidavit of Col. Rynerson, one of the counsel for the respondents, setting forth that in his draft of the answer sent to the printer, the denial of non-residence in the county had been properly inserted, but that the printer inadvertently dropped it out in setting up the matter in type, and that the omission was not observed by respondents' counsel until about the time of the first motion to amend.

After long consideration, the judge refused to allow the

amendment, and rendered a decision in favor of the contest-
ant in each case (December 14, 1881).

The respondents appealed to this court.   While the testi-
mony is very voluminous and the briefs and arguments are
of great length, yet the real questions necessary to be decided
are few.

1. The respondents held that although their answers did
not contain any specific denial of the allegation relative to
residence in the county, yet as they did contain a denial that
the voters in question " were then and there disqualified by
the laws of said territory from being registered as voters and
from voting at said election," that this general denial of dis-
qualification put in issue every separate allegation of cause
of disqualification, and brought up the whole question to be
determined by the proofs as fully as if every separate allega-
tion had been distinctly, separately and specifically nega-
tived.

In this I think the respondents are wrong.   The case in
31 Cal., 185 (*Fish v. Redington*), and others cited by coun-
sel, seem almost conclusive as to this; but apart from any
authorities I should have no doubt on the point.   The law
distinctly says that " any material fact alleged in the notice
of contest, not specifically denied by the answer, shall be
taken and considered as true."

The object of the law is, evidently, to frame a distinct
issue as to each vote called in question.

The notice of contest is to state distinctly the ground of
objection, and the answer is to deny the same specifically, or
else it will be taken as confessed.

It is true that, in this case, the contestants disregarded or
evaded the law, by not specifying in sixty-seven instances
any particular ground of objection; but this fault should
have been remedied by application to the court to have the
notice made more definite.   When the respondents answered
they waived the impropriety of form, and subjected them-

selves to answering the notice just as it was. The law, in terms, requires a specific denial of each allegation, and no general denial could take the place of the specific denials required. Were this so, every contestant would simply deny, in general terms and in bulk, all the allegations contained in the notice, and thus the clear and distinct issue which the law was intended to provide for would be lost. It is plain, therefore, that under the pleadings (notice and answer) as they stood at the time of the reference—unamended—the respondents had no right to introduce evidence as to the county residence. That was not at issue, but by the default of the respondents was to "be taken and considered as true." If the judge had committed error in not allowing them to amend by inserting the omitted clause, their rights were all preserved by an appeal.

2. The respondents claimed that inasmuch as this was a kind of proceeding in which the people at large had an interest, no default or neglect on the part of the respondent could obviate the necessity of the case of contestant's being actually proved by evidence before the master.

In this, also, I think, they were in error. The object of the law, as before said, was to frame distinct issues as to each vote called in question. The notice might charge A with being an alien, B with being under age, C with not being registered, etc., etc.

On examination, the respondent might discover that the charge against B was correct. He would then deny, specifically, the allegation respecting A and C, but by silence admit the truth of that relating to B.

In such case, it would, obviously, be unnecessary to produce testimony as to B. No issue as to him is presented. It is conceded that his vote was illegal. So the law says very properly that in such cases the fact thus admitted by lack of denial "shall be taken and considered as true."

In this instance the allegation as to non-residence in the

county for the required length of time was uncontradicted and so was "taken as true," without proof.

This I believe to be the correct rule and practice, and the authorities are to that effect. See *Moore v. Sanborin*, 42 Mo., 495, etc.

On the case, then, as presented by the pleadings, as they went before the master, I consider that the subsequent proceedings and judgment were regular and correct.

This brings us to the main and vital question involved in the case, viz.: whether the application of the respondents for leave to amend their answer should have been granted; or, rather, whether the court has power in a proper case and in furtherance of justice to grant such an order.

In the instance before us, it is obvious that the omission of a specific denial of this one of the five allegations against the respondents was the result of accident, either from carelessness in writing the manuscript from which the form of this part of the answer was to be printed, or by omission in setting the type from which it was printed. The printed form of answer follows the printed form of the notice, with the exception of this omission; and the five words at the end of the preceding clause "had not resided in said territory for a period of six months immediately preceding said election" being exactly the same as those of the omitted clause, "had not resided in said county of Doña Ana for a period of three months immediately preceding such election," made it very natural for the compositor to skip the clause by thinking that he was at the end of the latter when really at the end of the former.

But however the mistake occurred, it is not questioned that the respondents intended to deny the allegations of the notice *seriatim*, as they were stated.

The failure to do so was practically giving up their case in advance.

An answer containing such an omission was equal to no

answer at all. The contestant was as fully entitled to judgment on this one omission, as if the denials of the entire series of allegations in the notice had been omitted, and, of course, no one would intentionally incur the trouble and expense of a protracted litigation on pleadings known to be defective as a foundation.

It was argued by counsel for the contestant that under the circumstances could the decision of the court below in denying the motion to amend be reviewed here, because:

1st. If the provisions of the election law are mandatory, then the judge had no power to grant an amendment, and his refusal of course cannot be reviewed; and,

2d. If those provisions are not mandatory, and hence the judge below had power to allow an amendment, then the subject was one of those entirely within his sound discretion—appealing to his judicial conscience—and not subject to revision on appeal.

But in this they ignored a third possible situation, viz.: If the judge below possessed the discretionary power to allow an amendment, but believed that he did not possess it, and consequently denied the motion not in the exercise of his judicial discretion, but distinctly on the ground that he did not possess any power or discretion at all.

In this last case, the action of the judge would be founded on a mistake of law, and consequently reviewable, and the appellate court in overruling his decision, would simply remand the question to the judge for the exercise of that sound discretion which he had declined to act upon before, because he believed that he did not possess the power.

The allowal or refusal of an amendment is generally a matter of discretion with the judge to whom the application is made; and had the learned judge below considered this application upon its merits, and decided it in the exercise of his judicial discretion, it is at least doubtful whether this court could have properly overruled his determination on appeal.

On this point the contestant's counsel argued ably and fully, producing a long array of authorities to sustain their position, that the execution of this discretion is not reviewable in an appellate court, but I do not think that this question really enters into the consideration of this case; for, as appears from the language of the judge himself, in his written opinion, and as was conceded by all parties on the argument, the judge denied the motion for leave to amend, not on its merits or in the exercise of his discretion, but on the express ground that the judge in such cases has no discretion at all to exercise.

His words are, "these statutory provisions as to time of filing and serving the notice of contest, answer and reply, are really statutes of limitation, taking from the judge all discretion as to extending the time."

This, then, is the real question for consideration, "whether the judge, before whom an election contest is being tried in a proper case, has a discretionary power to grant leave to amend after the expiration of the time for answering fixed by statute?"

There is no doubt that where such power really exists, and a judge declines to exercise it for the avowed reason that he believes he does not possess such power, it is good ground for reversal.

"Where a judge at circuit has a discretion to allow an amendment of the pleadings, but refuses to exercise it, on the ground of want of power, such refusal is error of law and ground of appeal." See *Russell v. Conn*, 20 N. Y., 81, and other cases cited; 1 Wait's N. Y. Digest, 79; 17 Minn., 296, in analogous.

Before proceeding to examine the question of power, I think it not out of place to remark that in the first judicial district, it has been exercised in various cases since the enactment of the existing law, and without a single suggestion by counsel, even in contests exciting much public interest, that

there was doubt of the existence of such power, or the propriety of its exercise.

Thus in the case of *Santos Munes v. Juan Sanchez*, which was one of the so called "Taos election cases," which created some excitement in 1879, the notice of contest was filed December 11th, the answer was not filed till February 11th, the time having been extended by consent; on February 28th a replication was filed; and as late as April 9th notice was given by the respondents of a motion to amend their answer by inserting new matters. It was not opposed, although the case was being strongly contested, and an order was made granting the leave, yet the amendment was a very material one, involving no less than 107 votes in ten different precincts, which were then for the first time alleged to be illegal. This was of course a far stronger case than that now in question, in which simply a denial, obviously omitted by accident, was to constitute the amendment, but it is only referred to as showing that the power of the judge, in the execution of his judicial discretion to allow such an amendment, had not been doubted hitherto in the first district.

The territorial statutes relative to election contests contain nothing whatever as to amendments.

It is at least very doubtful whether the liberal provisions of law relative to amendments in ordinary civil cases, which have existed in this territory for over thirty years (see Act 27 of July 12, 1851), apply to a contested election case under the recent statutes. So that we are compelled to look for guidance to the rules of the common law, and the general principles which should govern such cases.

Much stress has been laid by counsel on the words " within the time aforesaid " in section 2 of the act of 1876, p. 344, General Laws, and the precise technical signification and power of those words gave rise to a large amount of discussion.

On the one side it was contended that they were " words of

Bull v. Southwick.

limitation ;" that they absolutely and irremediably limited the time in which a denial of the alleged facts could be interposed, and that on the expiration of that time there was no power in the courts to extend it or allow an amendment of such denial, no matter how strongly the application might appeal to its sense of right and justice. Though the sickness of the contestant, or the death of his counsel, might have delayed the filing of the answer ; though the messenger charged with it might have been waylaid on his journey ; though by accident, or fraud or collusion, some material words might be omitted from it ; though evidence of gigantic fraud might be discovered the day after the expiration of the twentieth day ; though it might become patent to all that the will of the people was being disregarded and subverted, yet, according to this view, these words presented such an absolute and positive barrier to any remedial action by the court, that all opportunity for relief was cut off.

On the other hand, it was argued that these words, while they fixed the time in which, in ordinary cases and without the direct action of the court, the answer should be served, and the issues made up, yet that neither by the language used, nor according to the intent and purpose of the law, were they so distinctly mandatory and absolutely prohibitory, as to prevent the court, in a proper case, in furtherance of justice, and in the exercise of its sound judicial discretion, from allowing an amendment afterwards.

So far as the precise language employed is concerned, it was shown that it does not differ materially from that used in many statutes in various states as to times for pleadings both in ordinary cases, and also in election contests, in construing which the courts have held not only that the limitation did not prohibit the allowance of an amendment in furtherance of justice, but that the time might be extended in a proper case and for good cause shown, for the filing and serving of the entire pleading. Not to go outside of cases

of election contests for precedents or illustrations, the case of *Dale v. Irwin*, 78 Ill., 171, is an important one, and specially so with us, because the statute under which the election contest, which is its subject, was conducted, is quite analagous to ours.

This statute is chapter 46 of the system of laws which, under the new constitution, went into effect July 1, 1872.

Section 113 provides that the persons desiring to contest an election, shall, " within 30 days " after the declaration of the result, file with the clerk of the court, a statement in writing, setting forth the points on which he will contest the election.

The election in question was held April 13, 1874, and the "statement" was filed within 30 days.   At the October term of the court, the defendant moved to quash the petition, and the motion was granted.

" Whereupon the petitioner obtained leave to amend the petition, which was done."   Afterwards, at the same term, leave was granted to the petitioner to amend his amended petition, which was done.

The defendant moved to strike the amended petition from the files, and subsequent to the second amendment, again moved to strike from the files, both of which motions were disallowed.

On appeal, the court says, " The ground assumed by the appellee in his exception to the order allowing the petition to be amended is, that this being strictly a statutory proceeding, the petitioner should be confined to the points made in his original statement, or petition ; that the proceeding being neither in chancery, nor at the common law, the court had no power to allow amendments of any kind, but should be guided by the statute alone, and as no provision is made therein for amendments, the court was powerless to allow them.   *   *   *   We cannot think the position taken by defendant as to the meaning and purpose of this act, tenable or just.   If he is right in seeking to confine the contestant

to the points contained in his original statement, great injustice might be done in many cases." And the court sustained the amendments.

It will be observed that in this case the amendments were made five months after the prescribed time had expired, and when the period for actual trial had arrived.

Again, the act of congress as to contested elections (Feb. 19, 1851), provides that the contestant shall, "within ·thirty days after said election, give notice," etc. Yet the allowance of amendments and of more time to prepare and file this notice are frequent, and in one case (*Wright v. Fuller*, 1 Bartlett, 112), the true rule of construction was tersely stated as follows: "This statute shall receive a reasonable construction; one that will carry out and not defeat its spirit and purpose."

A case very nearly analogous is found in *Stevenson v. Lawrence* tried in Pennsylvania, in 1862. This was a contested election case, and the question which arose was based on the following language in the statute, being part of the fifth section of the act of July 2, 1839: "The court shall hear and determine such contested election at the next term after the election shall have been held." On the one side it was contended that no action having been taken by the court at the "next term" after the election, its jurisdiction had ceased and its power was gone; that the language was mandatory and imperative, and the limitation absolute.

On the other hand, it was insisted that the provision should be counted to be merely directory, and that there should not be a denial of justice and a disregard of the expressed will of the people at the polls, simply on account of an informality in the method or time of bringing the matter before the court. The decision of the court sustained the latter view, and the following language of the opinion delivered then is so appropriate, that it might almost have been written for this case, and is well worthy to be reproduced here. It was as

follows : " The design of the law is to secure an investigation of a matter in which the citizens generally and the candidate claiming title to the office by election are deeply interested.   Questions are involved in such an issue of the gravest importance, affecting alike the highest principles of honesty and fair dealing between man and man, the purity of the ballot box, and the vindication of the elective right of the citizens of the commonwealth; to guard these rights, each of them sacred and worthy of legislative protection, the courts are enjoined to investigate the merits of the case, and finally determine the same according to law.   *   *   * Is the law to be regarded as a dead letter?   Are the citizens and contestants alike to be turned away and told that the stroke of the clock has paralyzed the arm of the court, and that they must go without remedy for an alleged violation of public and private rights, because that which was not of the essence of the thing to be done had not been complied with by the officer of the law, either with or without cause?   I think not.   I can gather no such meaning from the act, and can regard the command as to time only in the light of an injunction to the judges to speed the cause, and at the next term, if possible, fulfill the material requirements of the law, by finally determining the case upon its merits. Any other view, it seems to me, reverses the natural order of things ; prefers the unimportant to the material ; gives to the minor consideration, namely, the time within which a decision is to be rendered, precedence of the more substantial and weighty matters of the law under consideration, for, certainly, it is far more essential that the courts shall decide the main question than allow it to fall dead before the judges, who are enjoined to decide upon it finally, and upon its merits, by language quite as explicit as that used to indicate the time within which it ought to be determined :" Brightley, p. 532.   The only words, according to the established rules of construction, which are absolutely prohibit-

ory, *per se*, are words of negation. Negative words are required in order to make a statute so imperative as to cut off all remedial power of the courts.

Bacon's Abridgment, vol. 9, p. 234, under the title " Statute," states the proposition distinctly, and gives a number of illustrations, among which are the following : If a statute without any negative words declare that deeds shall have in evidence a certain effect, provided particular requisites are complied with, this does not prevent their being used as evidence, though the requisites were not complied with : *Jackson v. Bradt*, 2 Caines, 169.

" Though 54 Geo. III, c. 84, enacted that the Michaelmas quarter sessions shall be held in the week next after the eleventh of October, it· is held merely directory, and those sessions may still be held at another time ; but negative words would have made the statute imperative :" *Rex v. Justice of Leicester*, 7 Bar., etc., 6.

In Dwarris on Statutes, 2d London ed., 417, after laying down this distinction very clearly, and enforcing it by a number of cases, the following example is cited, which seems quite pertinent to the question now under consideration : " So, where the question was whether an appointment of overseer, made after the expiration of the time limited by a statute for such appointment was valid, it was held to be so, for the statute (43 Eliz., c. 4) ought to receive a liberal construction. Although the statute be introductory of new law, no negative ought to be implied :" *Rex v. Sparrow*, Bolt, 11.

Had the language of our law under consideration been, " within the time aforesaid and not afterwards," or had it. contained some such provision as, " and no pleading shall be filed, and no amendment thereto allowed, after the time hereinbefore designated," the language itself would have been in such form as to have admitted of no question as to its mandatory character. The negative words would have shown that the legislature's intent was absolutely to prohibit

any action after the periods designated, and we should have been precluded from any other construction, however unfortunate such a provision might have been in its results, or however strongly such an imperative limitation might appear to work against the object intended to be accomplished by the law.

For it is the first principle of the legal construction of statutes that courts cannot alter by judicial interposition or construction that which is clear and unambiguous in the law itself. Thus Vattel says, " the first general maxim of interpretation is that it is not allowable to interpret what has no need of interpretation." Domat expresses the same idea as follows :

" If the language of a law clearly expresses its meaning and intent, that intention must be carried out " (sec. 284), and Sedgwick briefly states the proposition, that " where the statute is plain, no room is left for construction : " Sedgwick on Statutes, etc., 231, citing *Forber v. Blight*, 2 Cranch, 358 and 399.

But in the statute in question, no such negative words appear. Those employed are affirmative, and while they certainly direct as to the manner in which the legislature desired the proceedings on the contest to be conducted, yet we are not precluded from considering whether the fulfillment of the intent of the law and the accomplishment of its objects, may not be of such paramount importance as to justify a court in the execution of its sound discretion in allowing an amendment to a pleading even after the time so designated.

. The object of a law is always the first thing to be considered. Laws are passed by legislatures with the intention of accomplishing something—not of being mere aggregations of words in the statute book, without force or effect. And when that object is clear and obvious, it is unreasonable to suppose that the legislature intended that some provision as

to the details of the methods arranged for its accomplishment should be so strictly construed as to defeat the attainment of the object itself. This would be making the means paramount to the end, and elevating the form above the substance. Sedgwick says, in examining such matters, the first matter for consideration is "the object to be attained," the second, "the means to be employed:" Const. Stat. Law, 229. And this is but putting into language what is the common sense of the matter, because the object is not selected in order to provide certain means, but the means to carry out the object. The methods prescribed are of no consequence of themselves, they are simply valuable in order to attain the object sought. If they do not succeed in accomplishing that, they are useless; if they actually prevent its accomplishment, they are worse than useless. They then cease to be means, and become obstructions.

Now let us apply these suggestions to the law before us. The object of the law as to contested elections is obvious. There is and can be, no dispute about it. It is to carry out the will of the people as expressed at the election, by putting into office the persons really elected. That is its object and only object.

To accomplish this, it provides certain methods of procedure; that an issue shall be framed as to disputed points and submitted to a court, and that in such framing each party shall have a certain time in which to file his statement, etc. These are convenient and proper provisions, looking to the orderly administration of justice in such cases. But these details of practice are not to be construed as of such cast-iron rigidity as to defeat the whole object of the law itself.

Had the power of decision been delegated to a clerk or some ministerial officer, whose authority could extend no further than the simple counting of votes, and declaring a result, there might have been no redress in case of accident or mistake. But the law very properly provides for adjudi-

cation by a court or a tribunal which has the inherent power subject to the limitation of statutes, to allow amendments in furtherance of justice, and to construe uncertain expressions in laws so as to uphold rather than defeat their primary object.

Several cases cited by the counsel for contestant apparently opposed to this view, will be found to refer only to a failure to file and serve the first notice in the case, that which is its initiatory step, in the time specified: *Costillo v. St. Louis County Court*, 28 Mo., 259; *Corbett v. Bradley*, 7 Nev., 107, etc. But that is an entirely different proposition, for this particular failure goes to the jurisdiction of the court itself. If the case is not commenced within the prescribed period, then the court has no jurisdiction of it, and it cannot possibly give to itself jurisdiction by any act of its own—it cannot allow an amendment or grant an extension, in a matter which is not legally before it at all; but when its jurisdiction has once been gained by a proper commencement of the proceedings, then the court has full power to do whatever is necessary for its proper progress in future.

Again, it was argued, and several authorities were cited to sustain the proposition, that courts should not look with favor on applications to amend made after the time prescribed because the party injured by the defective pleading is in that position by his own fault, laches or mistake, and if he has neglected the proper measures for defense, he must abide the result of his own carelessness; and that in the construction of statutes which prescribe precise and definite times for the performance of certain things, this principle should be applied and a strict construction be adopted.

But this rule, while applying generally to actions between individuals, I think is too narrow to be necessarily followed in cases where far broader and more extensive interests are involved.

In most cases which involve only the rights of the respec-

tive parties and affect no one else, a party may lose his rights and remedies by laches, inattention or mistake of law, and this is necessary for the prompt adjudication of questions and is perhaps but a fair and proper penalty for the carelessness of the party or his attorney. He only is interested, and he can by consent or stipulation or default abandon all his rights, as fully as he has power to control, give away or waste his property if he is so disposed.

But there are certain classes of cases which are not simply between the parties appearing on the record, but by which the whole community is affected, and in which it has an interest.

· In divorces, for example, there are questions of public policy and the maintenance of the institutions of society involved, which are considered by the law as paramount, even to the desires of the individuals concerned, and no decree can be obtained by the laches, the default or even the consent or request of the parties alone.

Such a course would be *contra bonos mores*, would place an institution which lies at the basis of the frame-work of modern society at the mercy of the caprice of individuals, and could not be tolerated for a moment without an entire change in our civilization.

In the case of an election the public interest is even broader.

The official is not elected solely for his own gratification or emolument, but for the public good. The people select him as their chosen representative to perform the duties of a particular position, and it is they who have the primary and greatest interest in the result of the election. In many states the performance of the duties of certain offices is made obligatory on those elected or appointed; they are not permitted to decline to act, and are subject to penalties for a failure to perform the duties.

In no case can an elected officer, by declination or resigna-

tion, alter the intention of the people so far as to elect some one else, whom they have not chosen.

It may be broadly stated that the minority cannot elect in any case.   Thus, in this country, it is well settled that where it appears that the majority candidate is ineligible, and, therefore, cannot assume the duties of the office, yet that does not elect the candidate having the next highest number of votes.   It has been evident, by the result of the election, that he is not the choice of the majority, and he cannot be forced into office by the courts after being rejected by the people:   *Commonwealth v. Cluley*, 56 Pa. St., 270; *Saunders v. Haynes*, 13 Cal., 145; *State (Wisconsin) v. Giles*, 1 Chand., 112; *State v. Smith*, 14 Wis., 497; Opinion of Judges, 32 Me., 597; *State v. Boal*, 46 Mo., 528, etc.

If A and B are candidates for an office, and A receives 300 votes and B 200, A cannot, by declining or resigning, put B into the office.   It is not a question between A and B, but one in which the people, who are to elect, have the highest and most vital interest.   In such a case, whether A accepts the office or not, it is certain that B is not their choice; and no action on the part of the one individual A can change the expression of the popular will, or put into office a man not elected by the people.   And if A cannot do this by resignation, it is equally obvious that he cannot do it by stipulation or consent, or abandonment, or collusion, or by any act of his own.   He is not the electing power, but the whole people of the state, county or district are.   The object of a popular election is to ascertain the choice of the people, and the object of laws relating to elections and election contests, is to carry into effect the people's will, as there expressed.

The language of Chief Justice Field of California, now of the Supreme Court of the United States, tersely states what I believe to be the true doctrine in cases of this nature.

" The public is interested in a contest of this character; it is not a matter solely between the parties to the record, and

Bull v. Southwick.

the popular will is not to be set aside upon a mere failure of a party to respond:" *Slarcy v. Grove*, 15 Cal., 119.

From a consideration of the whole subject, I believe that there was no intention on the part of the legislature which enacted our contested election law so to restrict and hamper the action of the courts as to prevent the accomplishment of the great object for which that law was enacted, and to put into office those rejected by the people, instead of those elected. I am satisfied that after the court had once obtained jurisdiction, it had the power, in the exercise of a sound discretion, to do all such things as would tend to a determination of the contest in accordance with the facts; and bring about a judicial result in conformity with the expressed will of the people at the polls. I have no doubt, as the law in terms says (sec. 8) that, "judgment shall be rendered in favor of the party for whom a majority of the legal votes shall be proven to have been cast at the election," that when it is shown to a judge that by a clerical error such a judgment is rendered impossible, unless such error be corrected, it is the duty of that judge to entertain an application to amend such error and decide on such application as the facts shown and the expressed intent of the statute require.

So believing, I think that the learned judge below erred in not considering the motion to amend the respondent's answer on its merits, and in holding that he had no power or discretion to allow any amendment.

The case, in my opinion, should be remanded to the judge presiding in the third district for the exercise, by him, of his judicial power and discretion in the decision of the motion made by respondents for leave to file their amended answer on the facts as presented on their application.